# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 13, 2011 Session

## STATE OF TENNESSEE v. RANDY RAY MCFARLIN A/K/A MAC RAY MCFARLANE

**Appeal from the Criminal Court for Rutherford County**
**No. F-61796      Don R. Ash, Judge**

---

**No. M2010-00853-CCA-R3-CD - Filed January 9, 2012**

---

The defendant, Randy Ray McFarlin, also known as Mac Ray McFarlane, appeals as of right his Rutherford County Criminal Court jury convictions of one count of first degree premeditated murder, *see* T.C.A. §39-2402(a) (1981), and one count of second degree murder, *see id*. § 39-2403(a), for which he received a sentence of life imprisonment. On appeal, he contends that the trial court erred by denying his motion to dismiss the indictment, that the evidence is insufficient to support his convictions, and that the trial court erred by admitting (1) scenes from the movie *Miller's Crossing*, (2) evidence of the defendant's and victim's participation in a 1982 robbery, (3) evidence of the defendant's abusive treatment of his ex-wife, and (4) photographs of the victim's partially decomposed body. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Luke A. Evans, Murfreesboro, Tennessee, for the appellant, Randy Ray McFarlin a/k/a Mac Ray McFarlane.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; William C. Whitesell, District Attorney General; and J. Paul Newman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On April 28, 1982, two fishermen discovered a partially decomposed body near the edge of Percy Priest Lake on an area of "very remote and not easily accessible" Army

Corps of Engineers' property located in Rutherford County. La Vergne Police Department officers referred the investigation to the Rutherford County Sheriff's Office (RCSO). Then-RCSO Detective David Grisham arrived at the scene to find "a cadaver that had apparently been out there for quite a while." He described the body as "[a]ctually only half of a cadaver" because it was "intact" only from the waist down; "a lot of [the upper body] was missing" as only a rib cage, spinal column, and shoulder bones remained. Although the investigators found no skull, they did locate skull fragments and matted hair near the body. Authorities transported the body to the Middle Tennessee Hospital morgue for a coroner's examination, where they noted the presence of scars on the right knee.

Detective Grisham checked the body for a wallet or identification and found neither. The body was clothed in only jeans and clean socks, and the investigators found no shoes at the scene. They did recover, however, a portion of a shirt collar and a list of names and telephone numbers in a pocket of the jeans. The investigators also collected an empty Miller beer bottle, a Winston cigarette pack, and a lighter near the body. The lighter contained the inscription "GENE."

Rutherford County Deputy Coroner Michael Cawthorn arrived at the scene and observed a body in the "advanced stages of decomposition." He "guesstimated that [the body] was approximately four to six weeks old." From the collected skull fragments, he was able to piece together a portion of the skull and discovered a bullet hole in the front of the skull. Also a firearms instructor, Mr. Cawthorn opined that the hole "could have been made from anything from a shotgun pellet up to as much as a .38, .357, [or] maybe even possibly a .41 caliber" bullet.

On May 2, 1982, Detective Grisham contacted Doctor William Bass, a forensic anthropologist with the University of Tennessee, to assist in the identification of the body. Doctor Bass and his assistants traveled to the scene several days later where they observed "quite a bit of scatter" due to animal activity that had occurred around the corpse. He observed that not all of the skull fragments could be recovered and were probably eaten by scavengers. Nevertheless, he and his assistants located several additional bones from which they were able to piece together a large portion of the skull. From this reconstructed skull, Doctor Bass determined that the victim died from a "major wound to the skull." He opined that the victim suffered a "gunshot wound from the back and . . . upper left" that created an exit wound above the right eye. He was unable to recreate the entrance wound because not enough pieces of the skull were found. He did, however, find two skull fragments that could not be connected to any other found fragments. He determined that the skull had been shattered at the entrance wound and that a shotgun was the likely weapon. He further opined that as pellets from the shotgun shell scattered throughout the victim's brain, one or more of the pellets created the exit wound.

RCSO Chief Deputy Asbury, a detective in 1982, collected evidence at the crime scene as well. Through the list of telephone numbers, the cigarette lighter inscribed with the name "Gene," and the scars on the victim's leg, investigators determined the victim to be Errastus "Gene" Stump. Although there were initially "an infinite number" of suspects in the victim's death, ultimately their investigation revealed that the defendant had the only motive to kill the victim.

Then-RCSO Deputy Steve Pickel also collected evidence at the scene. He retrieved a beer bottle, clothing scraps, a cigarette pack, shotgun wadding, and a list of telephone numbers. By calling the telephone numbers, the investigators contacted a friend of the victim who was able to identify the victim's body.

On April 29, Deputy Pickel also contacted the defendant, who was one of the victim's friends and co-workers. The defendant told Deputy Pickel that he had last seen the victim on March 29 at the defendant's home. He told Deputy Pickel that the victim arrived at his home with some people in a van and that the victim told the defendant that he was leaving with the people to go to Ohio. The defendant said that he loaned the victim $200 and gave him a couple of beers. The defendant claimed that the victim also asked the defendant to take the victim's car and last paycheck to the victim's ex-wife. The defendant called a mutual friend to help him deliver the car to the victim's ex-wife. The defendant claimed that the victim asked him to keep his guns for him. He told Deputy Pickel that he never heard from the victim again.

On May 3, Deputy Pickel spoke to the defendant again. Once more, the defendant told Deputy Pickel that the victim left in a van with some people who were going to Ohio. The defendant also told Deputy Pickel that he was familiar with the area where the victim's body was found and that it was a place where people frequently shot targets. The defendant admitted that he helped the victim prepare his income tax return and that when the tax refund check arrived, the defendant endorsed it and deposited it into his personal account for money the victim owed him. The defendant claimed that he had socialized a lot with the victim in the past but that he "had not been running around with [the victim] as much" in the months leading up to the victim's death. In a May 11 statement, the defendant admitted that he and the victim had recently robbed a Kwik Sak market in Smyrna. The defendant later pleaded guilty to that offense.

During the course of the investigation in 1982, the defendant never admitted killing the victim. Deputy Pickel considered the defendant "no more a suspect than some other people." No arrests were made for the victim's murder, and the case remained unsolved for over 20 years.

RSCO Chief Deputy Virgil Gammon assisted in the investigation at the scene in April 1982 when still working as a detective and recalled the items collected on and near the body. Sometime in the 1990s, a sewage flood at the jail rendered most of the evidence collected at the scene unsalvageable, and most of the items were discarded. When investigators re-opened the case in 2007, they located only the victim's reconstructed skull and the hair mass.

Detective Dan Goodwin worked with the RCSO's cold case unit, which was created in 2007. Detective Goodwin interviewed several of the victim's and defendant's coworkers who had never been interviewed during the 1982 investigation. He also learned that the defendant had been married three times in the years since the victim's death. He interviewed each of the defendant's ex-wives: Donna Burroughs, his wife at the time of the victim's death; Joyce Dannette Mallard, his wife for a brief period of time in 1992; and Ellen Marie Buckman, his wife of over 12 years until their divorce in 2006. Through his investigation, Detective Goodwin learned that the defendant had made inculpatory admissions to each of his wives. Ms. Burroughs admitted making a false statement to the investigators during the 1982 investigation because she was "coached" by the defendant. In the ensuing years, the defendant had also legally changed his name twice – to Randy Ray MacFarlane and then to Mack Ray MacFarlane.

In April 2008, Detective Goodwin interviewed the defendant at his place of employment in Bristol, Tennessee. The defendant admitted his participation in the Kwik Sak robbery, yet he denied that he spent much time with the victim from the time of the victim's divorce in November 1980 until his death in March 1982. The defendant also denied any knowledge of the crime scene or circumstances of the victim's death, contrary to his 1982 statements. For the first time, the defendant reported that the victim had been seeing James Hirlston's wife; the Hirlstons were mutual friends of the defendant and victim. Significantly, the defendant did not claim that the victim left town with some people to go to Ohio as he had reported in 1982. Detective Goodwin's investigation revealed that the defendant had stolen the victim's wallet, money, and cowboy boots. Based upon the discrepancies between the 2008 statement and previous statements, Detective Goodwin arrested the defendant for the victim's murder and robbery.

In May 2009, Steve Scott, a firearms expert with the Tennessee Bureau of Investigation (TBI), analyzed the hair mass recovered near the victim's body and located several lead particles and bone fragments within the hair. He found what appeared to be shotgun wadding, but his testing could not conclusively determine it to be so. Special Agent Scott did, however, locate buffer material from a shotgun shell within the hair mass and forwarded it to the TBI microanalysis unit for further testing and comparison to shotgun shells produced in the 1980s.

In June 2009, TBI Special Agent Randall Kirk Nelson analyzed particles recovered from the hair mass by Special Agent Scott. He compared the particles to buffer material from both Remington and Federal 12 gauge shotgun shells and determined that the particles were "consistent with buffer material . . . [of] the Remington 12 gauge shotgun cartridge."

In August 2009, Doctor Sandra Thomas, a forensic pathologist with the Tennessee Medical Examiner's Office, performed an autopsy on the exhumed remains of the body. She noted the "skeletalization of the body" at that time. She also noted the well-preserved lower extremities of the body from which she observed no other apparent injuries that may have contributed to the victim's death. Doctor Thomas reviewed Doctor Bass's report and concluded that her autopsy revealed nothing inconsistent with his conclusion that the victim died of a gunshot wound to the head. She further agreed that the severe fragmentation or absence of the back of the skull was consistent with the victim's suffering a shotgun blast to the back of the head. Doctor Thomas removed a portion of the victim's femur bone and forwarded it to Orchid Cellmark, a private deoxyribonucleic acid (DNA) testing laboratory, for DNA testing.

Romy Franco, a forensic DNA analyst with Orchid Cellmark, performed mitochondrial DNA testing on cells extracted from the victim's femur bone. Through comparison with an oral swab DNA sample of the victim's brother, Steve Stump, Ms. Franco determined that the femur "most likely" came from Gene Stump. Deanna Lankford, another forensic DNA analyst with Orchid Cellmark, performed a parentage DNA analysis of the cells from the femur by comparing them with an oral swab DNA sample from the victim's son, Jason Stump. Ms. Lankford determined within a 99.9 percent certainty that the femur came from the victim. Additional testing of the bone fragments recovered at the scene revealed a positive match with cells extracted from the femur.

At the defendant's January 2010 trial, Steve Stump testified that the victim moved from West Virginia to Tennessee in 1977 in search of employment. Mr. Stump, likewise, came to Tennessee for work and lived with the victim for some period of time. At the time of the victim's disappearance, Mr. Stump initially thought that the victim "took off and went to West Virginia," despite the victim's having a good job and two children whom he loved. He recalled the detectives' coming to his home to tell him the victim's body had been found. He expressed no doubt that the victim was the person buried in the family cemetery in Stump, West Virginia.

Mary Stump Godfrey met the victim in West Virginia in 1975 and later moved to Murfreesboro, Tennessee with him, where they soon married. The couple had a son together, Jason, and the victim also raised Ms. Godfrey's daughter, Rachel, as his own. She

said that the victim was good to her two children. She also described him as hard-working and dedicated to his job at Thompson and Green Machinery, where he worked with the defendant. The couple divorced in 1980. By 1982, however, the couple was working hard to reconcile. Ms. Godfrey testified that the victim spent a lot of time "running around" with the defendant going to bars and drinking, but by 1982 he wanted to get away from the defendant "to be with the kids." Ms. Godfrey recalled that she learned of the victim's death while out of town with friends. She said the victim typically carried a wallet and that he "always had money." She said the victim always wore jeans, western shirts, and cowboy boots. She also recalled that the victim always carried a lighter inscribed with his name and that he smoked Winston cigarettes and sometimes drank Miller beer. She also said that she never reported the victim missing because it was not unusual for the victim to stay gone for days at a time after their divorce.

Jason Stump, the victim's son, was only five years old when his father died. He learned of the victim's death from his mother. He testified that he had no doubt his father was the victim in this case.

Rachel Stump Tucker, the victim's stepdaughter, was 11 years old when the victim died. She remembered her mother telling her that the victim was gone, but she actually learned of the victim's death from a "Crime Stoppers" report on the local television news. Ms. Tucker remembered that the victim always wore jeans and brown boots. She said he was "always dressed up like a cowboy." She acknowledged that the victim and her mother had separated at the time of his death, but she remembered that the victim was trying to be a "better dad."

James Hirlston was a close friend of the victim in 1982. Mr. Hirlston said that the victim had a close relationship with the victim's son and a good job. The victim always had money. He remembered the victim drank Miller beer and carried a cigarette lighter inscribed with his name. He said the police came to his home with a list of telephone numbers and the cigarette lighter, which he identified as belonging to the victim. The police then told him that the victim had been found dead.

Mr. Hirlston said that he last saw the victim on the morning of March 29 when he picked up the victim from a motel room and took him to his car in time to go to work. He recalled the defendant's telephoning him sometime about one month before the discovery of the victim's body. The defendant asked Mr. Hirlston to come pick up the victim's car at his home and take it to the victim's ex-wife. The defendant then told Mr. Hirlston that the victim had "left in a van with a bunch of people the night before." Mr. Hirlston never understood the defendant's explanation of the victim's leaving; he testified, "[I]t didn't make sense to me. There's too many friends and [a] good job and all that. Why would [the victim] just

walk off on all of it?"

Stephen Burns worked at Thompson and Green Machinery with both the victim and the defendant. He described the victim as a "good worker" who always showed up for work and often worked overtime. He said that the victim's not showing up for work in March and April 1982 was "very unusual." He found it "extremely hard to believe" that the victim "got into a van with a bunch of hippies," as was reported by the defendant. Mr. Burns also recalled that the victim and the defendant "got along real well." He said, however, that their friendship "seemed to be strained" immediately before the victim's disappearance.

Jerry Woodall, another former coworker at Thompson and Green Machinery, testified similarly that the victim was a "great guy" and a hard worker. He described the defendant as the "dominant friend" in the relationship with the victim. He opined that the victim would not have left town without notifying anyone.

Charles Head also worked at Thompson and Green Machinery with the victim and the defendant. He recalled that the victim never missed work unless he was "deathly sick," in which case he would always call in. He was concerned when the otherwise "very dependable" victim failed to report to work for such an extended time. He also thought it "very unusual" for the victim to leave town "with a bunch of hippies."

Billy Joe Smith described the victim as "one of the best friends [he] ever had." He said that he and the victim were roommates after the victim's divorce. Once when he was visiting his sister-in-law, Evelyn Smith, the police responded to a domestic violence report at Ms. Smith's home. When the police arrived, "[n]othing was going on." Several weeks later, the victim told Mr. Smith that the victim and the defendant had called the police to divert the police while they robbed a Kwik Sak. As the defendant overheard this conversation, he told the victim, "'You keep running your mouth, Stump. It could get you killed.'"

Evelyn Smith was married to Mr. Smith's brother, Walter, who died in May 2009. She met the victim in 1980 through the victim's wife, Mary. Ms. Smith described the victim as "a perfect fellow. Real nice and gentle. Real sweet. I mean he'd do anything for you." She said during the 1980s, the men would often all go out drinking together. She remembered that the police responded to a false domestic violence report and that the victim later admitted that he and the defendant had called it in to divert the police while they robbed a Kwik Sak. Ms. Smith said the defendant became angry with the victim's "running his mouth" and warned him to "shut-up" or "that's gonna get your ass killed." She recalled the victim's wanting to move back to West Virginia, but she said that he never would have left town without telling his son goodbye.

Charles Bickett knew the defendant as Mack Ray McFarlane when they met in the late 1990s in Kentucky. He said that once when he was out riding around with the defendant, the defendant admitted that he had shot a man in the woods with either a shotgun or a rifle 15 or 20 years before. Mr. Bickett did not really believe the defendant, whom he described as being "in a crying mood . . . sort of snotting around" when the admission was made.

William Sapp met the defendant as Mack MacFarlane in 2000 or 2001 while living in Kentucky. He testified that the defendant told him that he "took his friend rabbit hunting down by a river or a creek and that he [] killed him and made it look like an accident." The defendant told Mr. Sapp that he "thought the guy was going to testify against him," so "he wanted to take care of him." When asked why he did not report the defendant's confession to the police, he explained, "I didn't really think about calling the police. [I d]idn't know if he did it. [I d]idn't know if he hadn't done it. . . . [I] just know what he told me."

Joyce Dannette Mallard, the defendant's second wife, married the defendant in November 1992 and divorced him in 1993. She recalled the defendant's telling her that "he had murdered somebody and got away with it." Several times during their brief marriage, the defendant told Ms. Mallard, "'I've killed somebody before. I shot him.'" After the couple divorced, they still worked at the same factory. Ms. Mallard said the defendant would stop by her work station and threaten her and her children's safety by saying "'[y]ou know what I told you. You better never tell nobody because I will do what I said I will do.'" Ms. Mallard did not disclose the defendant's admissions until detectives contacted her in 2008. She explained that she was scared of the defendant throughout their marriage because the defendant hurt her "[a]ll the time."

Ellen Buckman, the defendant's third wife, married the defendant in December 1995 and divorced him in June 2006. She recalled that the defendant changed his name twice during their marriage and that he had a tattoo, "Donna" - the name of his first wife, on his arm. Before they were married, the defendant told Ms. Buckman "something horrible" about his past. She recalled that while telling her, the defendant "hung his head" and admitted he "shot that man and left him there to die." She said the defendant was "very emotional," "weepy," and "remorseful" as they spoke. The defendant told her that he killed the man because they had committed a robbery together and the man was planning on turning himself in. Ms. Buckman recalled that the defendant described the wooded scene where the shooting occurred in great detail. The defendant also disclosed that he returned to the scene several weeks after the killing and that the victim had been "torn up pretty badly by animals." The defendant then took the boots from the victim's body because he believed that the boots were the only way to identify the victim.

Ms. Buckman said that the defendant talked about the killing over 200 times throughout their marriage. She also said that the defendant was "unusually captivated" by the movie, *Miller's Crossing*, and would watch it repeatedly. She said that, during one particular scene, the defendant told her, "'That's what it felt like whenever I took Gene to the woods to kill him.'" Ms. Buckman related the defendant's account of the shooting:

> He told me that when he parked they got out of the truck. He let Gene take the lead. And they were walking through the woods. As they got closer, nearer to the body of water, after he felt like they had gone far enough, that they were in a good spot, that's when he decided to shoot him.

The defendant told Ms. Buckman that he shot the victim with a shotgun between his shoulder blades and then "he turned and he left that man there to die." Two video clips from *Miller's Crossing* were played for the jury: one showed a wooded area and pathway that was similar in appearance to the area where the victim's body was discovered; another clip portrayed the characters walking through the woods with one man begging the other man not to kill him. The trial court instructed the jury that the video clips were not shown as a re-enactment of the killing but that they could be considered for the effect they had on the defendant relative to his admissions to Ms. Buckman.

Ms. Buckman did not feel safe to contact the police until she left the defendant in June 2006 and returned to her family in Kentucky. She contacted the police within three days of leaving the defendant. She did, however, talk to her priest about the defendant's admissions prior to going to the police. She testified that she had been traumatized by the defendant throughout their marriage and remained scared of him.

Donna Burroughs, the defendant's first wife, married the defendant in 1978 when she was 18 years old. The couple divorced in 1992. Ms. Burroughs remembered the defendant's friendship with the victim and said that the two men "spent many hours out together" drinking at bars – "all that Urban Cowboy thing." She said that the last time she saw the victim, the defendant invited the victim to "sight his gun" with him. The victim came to their home, and then he and the defendant left together; the defendant carried a "long gun" as they left. The defendant returned home later that night "very excited . . . almost giddy." The next morning, when Ms. Burroughs saw the victim's car at their home and inquired about it, the defendant told her that the victim had left town and had instructed the defendant to give the car to his ex-wife. Ms. Burroughs recalled the defendant's saying that the victim "left in a van with some hippies." Some time after that, she remembered the defendant's taking the victim's tax refund check. She said that after the victim's disappearance, her marriage improved because the defendant stayed home more.

-9-

When the victim's body was found, the detectives questioned Ms. Burroughs. The defendant instructed Ms. Burroughs to tell the detectives that the victim came by their home to borrow some money but that she did not see the victim. He further instructed her to tell the detectives that the defendant came to her in the back of the house to get $200 for the victim, and then the victim was on his way. The defendant warned Ms. Burroughs not to mention anything about the men going out to "sight" the gun on the last night the victim was seen. The defendant admitted participating in the robbery of a Kwik Sak and was arrested.

Ms. Burroughs testified that the defendant mentioned the victim's death several times over the course of their marriage. Once, the defendant came home "really wasted" and went out on the front porch in his underwear. When Ms. Burroughs tried to usher the defendant inside, he yelled at her, "Do you want to be buried at the lake with Stump?" On another occasion, while out to dinner at Red Lobster, the defendant admitted killing the victim to get the victim's job at Thompson and Green Machinery. On other occasions, the defendant admitted shooting the victim in the back of the head and taking his boots.

Ms. Burroughs said that she never told anyone about the defendant's admissions until the detectives contacted her in 2008. When asked why she did not report the defendant, she said,

> The most important thing to me was that I raise my kids. And
> I know I would have been in danger. And my children mean
> everything to me. And I knew the best upbringing they could
> have was for me to be their mother and to be alive and well.

She also said that during her marriage to the defendant, she did not want to believe that he could do such a thing. She admitted that her 1982 statement to detectives was entirely a lie, but she explained that the defendant had abused her throughout their marriage. She reiterated that her "first and foremost goal" at the time was "getting [her] children to adulthood."

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999), the defendant elected not to testify.

The defendant presented the testimony of RCSO Detective Charles Barnes, who testified regarding the loss of physical evidence in the case. Detective Barnes noted that although many of the items collected at the scene were lost, no testing had been performed on the items because both the body and the evidence had lain in the woods for over a month before discovery and also because DNA testing was not available in 1982. He opined that

-10-

any testing would have been of no consequence.

Following deliberations, the jury returned a verdict of guilty in count one of first degree premeditated murder. In count two, the jury convicted the defendant of second degree murder as a lesser included offense of felony murder. The jury imposed life sentences in each count.[1] The trial court later merged those convictions, and the judgments reflect a sentence of life imprisonment for the first degree premeditated murder conviction. Timely post-trial motions followed. This case is properly before this court.

In addition to contesting the sufficiency of the evidence on appeal, the defendant contends that the trial court erred by denying his motion to dismiss the indictment based upon the State's failure to preserve evidence. The defendant also contends that the trial court erroneously admitted scenes from *Miller's Crossing*, evidence of the defendant's participation in the Kwik Sak robbery, testimony of his ex-wife regarding abuse, and gruesome photographic evidence of the victim's body as it appeared at the crime scene.

*Dismissal of Indictment*

The defendant moved pretrial to dismiss the indictment based upon the State's failure to preserve much of the physical evidence in the case. *See State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). He contends on appeal that the State's failure to preserve the evidence rendered his trial fundamentally unfair and that the trial court should have granted his pretrial motion to dismiss the indictment. The State notes that the defendant failed to cite to the record in the argument portion of his brief and urges this court to treat the issue as waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived"). Alternatively, the State argues that the defendant failed to show that the State was grossly negligent in failing to preserve the evidence or that the lost evidence was exculpatory. Therefore, the State argues the trial court correctly denied the motion to dismiss.

We agree with the State concerning the defendant's failure to cite to the record and additionally note that the defendant failed to include this issue in his motion for a new trial. The State's failure to preserve evidence does not always result in a dismissal. *Ferguson*, 2 S.W.3d at 917 ("Dismissal is . . . one of the trial judge's options."). To the extent that the defendant may have claimed relief via *Ferguson* in any manner that would merely result in the grant of a new trial, this issue is waived. Tenn. R. App. P. 3(e) ("[N]o issue presented for review shall be predicated on error . . . upon which a new trial is sought,

---

[1] T.C.A. § 39-2408 (1981) provided for a life sentence imposed by a jury following a second degree murder conviction.

unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). This court, however, may review an issue that would result in a dismissal. *State v. Keel*, 882 S.W.2d 410 (Tenn. Crim. App. 1994). Accordingly, despite the defendant's failure to cite to the record, we choose to address this issue limited to the trial court's denial of the motion to dismiss.

In *Ferguson*, our supreme court ruled that the due process principles of the Tennessee Constitution require that the State's failure to preserve evidence which could be favorable to the defendant must be evaluated in the context of the entire record. *Ferguson*, 2 S.W.3d at 916-17. If the State has a duty to preserve the evidence, the reviewing court must conduct a balancing test based upon the following three factors:

> 1. The degree of negligence involved;

> 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

> 3. The sufficiency of the other evidence used at trial to support the conviction.

*Id.* at 917. If the trial court's consideration of these factors reveals that a trial without the lost or destroyed evidence would be fundamentally unfair, the trial court may dismiss the charges, provide a special jury instruction, or take steps necessary to protect the defendant's right to a fair trial.

At the pretrial hearing concerning the motion, Detective Goodwin testified that when he re-opened the investigation of the victim's death in 2007, he soon discovered that much of the evidence had been destroyed when jail inmates caused a sewage flood of the evidence room sometime in the 1990s. Detective Goodwin located pieces of the victim's skull and hair, but the Miller beer bottle, Winston cigarette pack, note paper, and lighter could not be located. Chief Deputy Gammon testified that many items from several cases had to be thrown away or were otherwise destroyed when the evidence room flooded with sewage in 1997.

The defendant argued that the destruction of the items precluded any independent testing by the defense in preparation for trial and that, therefore, the State should

-12-

be precluded from referring to the evidence or the indictment should be dismissed. The State argued that the defendant failed to establish gross negligence; therefore, there was no basis to dismiss the indictment. The trial court agreed with the State that there had been no showing of gross negligence requiring dismissal of the indictment and denied the defendant's motion. The trial court ruled, however, that it would issue a limiting instruction concerning the lost evidence.

At trial, the defendant elicited testimony from expert witnesses that, although DNA testing would not have been available in 1982, DNA testing could have been performed in 2007 as long as any DNA evidence contained on the lost items had not degraded to the point of futility. Several witnesses also testified at trial that any fingerprint testing that may have been performed on the items would have been inconclusive in light of the victim and defendant's close friendship making their sharing cigarettes and/or the lighter highly likely and of the defendant's report that he gave the victim a couple of bottles of beer. Although the jury instructions are not contained in the record on appeal, the record does contain a discussion of the defendant's proposed instruction in light of *Ferguson* and the trial court's agreement to issue such an instruction.

Relative to a consideration of the *Ferguson* factors, we agree with the trial court's finding that the loss of evidence in this case cannot be attributed to gross negligence on the part of the State. Furthermore, the evidence reflects that testing of the items would not have produced any exculpatory results and that any testing likely would have been ineffectual. Over the almost 28 years between the victim's death and the prosecution of the case, the defendant confessed to killing the victim on numerous occasions to many individuals. Accordingly, we conclude that the State's failure to preserve a portion of the evidence did not render the trial fundamentally unfair and that the trial court correctly denied the motion to dismiss.

*Sufficiency of the Evidence*

The defendant also contends that the evidence is insufficient to support his conviction of first degree premeditated murder because, independent of the defendant's confession, there is insufficient corroborating evidence to show that the defendant was the person who killed the victim. The State argues that the evidence sufficiently corroborated the defendant's statement that he was the perpetrator.

We review the defendant's claim of insufficient evidence mindful that our

-13-

standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.*. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

To be sure "a conviction cannot be based solely on a defendant's confession and, therefore, . . . the State must present some corroborating evidence to establish the corpus delicti." *See State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008) (citing *State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000)). The corpus delicti consists of two elements: (1) a certain result has been produced, and (2) some person is criminally responsible for the act. *See State v. Shepherd*, 862 S.W.2d 557, 564 (Tenn. Crim. App. 1992). The State needs "only slight evidence of the corpus delicti . . . to corroborate a confession and sustain a conviction." *Smith*, 24 S.W.3d at 281. Furthermore, when a defendant confesses to a crime, the corroborating evidence "'need not be as convincing as the evidence necessary to establish a corpus delicti in the absence of any confession.'" *State v. Housler*, 193 S.W.3d 476, 490 (Tenn. 2006) (quoting *Ricketts v. State*, 241 S.W.2d 604, 606 (Tenn. 1951)). "Whether the [S]tate has sufficiently established the *corpus delicti* is primarily a jury question." *State v. Jones*, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999). All elements of the corpus delicti may be established by circumstantial evidence. *State v. Garmon*, 972 S.W.2d 706, 708 (Tenn. Crim. App. 1998).

In 1982, Tennessee Code Annotated section 39-2402(a) provided that "[e]very murder perpetrated by means of poison, lying in wait, or by other kind of willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree."

Code section 39-2403(a) provided that "[a]ll other kinds of murder shall be

deemed murder in the second degree."

The claim that corroboration of the defendant's confessions was required relates only to the State's obligation to establish the corpus delicti – "the body of the crime [or] evidence that a crime was committed at the place alleged in the indictment." *See Smith*, 24 S.W.3d at 281. The commission of a homicide was amply established by physical and expert evidence that the victim, whose body was found, had been shot in the head with a shotgun.

With the corpus delicti sufficiently established via corroboration, we do not believe that the defendant's confessions need to be otherwise corroborated. The defendant's multiple confessions established his culpability for the victim's death. At any rate, Evelyn and Billy Joe Smith both testified additionally that the defendant threatened the victim that his bragging about the Kwik Sak robbery "would get [the victim] killed." Ms. Burroughs testified concerning the last time she saw the victim alive at her home on the evening of March 29, 1982, and the victim's leaving with the defendant to go "sight" the defendant's "long gun." She also testified to the defendant's demeanor when he arrived home and his telling Ms. Burroughs that the victim would not be coming back. Details gathered from the scene concerning the victim's missing boots, location of the body, and condition of the body further established the defendant's culpability when compared to his statements concerning the same. Accordingly, we conclude that the evidence is sufficient to support the defendant's conviction of first degree premeditated murder and of second degree murder as a lesser included offense of first degree felony murder.

*Scenes from Miller's Crossing*

The defendant argues that the trial court erroneously admitted videotape excerpts of two scenes from the movie, *Miller's Crossing*, because "the prejudicial effect of the movie clips far outweighed any probative value." The State argues that the movie clips were probative of the defendant's guilt and provided context to the admissions he made to his third wife, Ms. Buckman, while viewing the movie. The State also asserts that the movie clips were not gruesome in any manner and, as instructed by the trial court, were not meant to be viewed as a re-enactment of the offense.

Questions concerning the relevancy and thus the admissibility of this evidence rested within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record.

-15-

*See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)); *see State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

We initially note that the defendant's characterization of this evidence as demonstrative is misplaced. The trial court specifically limited the consideration of the movie clips to explain the defendant's emotional response and ensuing confessions in conjunction with Ms. Buckman's testimony concerning the defendant's "unusually captivated" interest in the movie. The court specifically instructed the jury that the video clips should not be considered as a re-enactment of the actual offense. We must presume that the jury followed these instructions.

In this case, the trial court ruled that the video clips were admissible because they related to the defendant's emotional reaction and subsequent confessions while watching the movie. The question remains, however, whether the actual viewing of the video clips as it related to the defendant's emotional reaction and subsequent inculpatory statements was itself relevant to a material issue. *See* Tenn. R. Evid. 401 (defining relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"); *id.* 402 ("Evidence which is not relevant is not admissible."). To be sure, Ms. Buckman testified concerning the defendant's repeated viewing of the movie, his emotional reaction to particular scenes in the movie, and his statements concerning his involvement in the victim's death that were seemingly prompted by watching the movie. That being said, we do question the relevancy of the movie clips, particularly in light of Ms. Buckman's testimony that the movie plot really bore little similarity to the facts of this case other than the wooded scene's resemblance to the actual scene where the victim's body was discovered.

We conclude, nonetheless, that even if the espoused reason for admitting the testimony was inapt, any error in admitting the testimony was harmless. In our view, because the defendant made consistent inculpatory statements to numerous individuals and the trial court instructed the jury not to consider the video clips as a re-enactment of the offense, the risk of the video clips' being misleading or otherwise prejudicial was minimal. Accordingly, we conclude that the trial court did not commit reversible error by admitting the video clips.

-16-

Next, the defendant complains of the trial court's admission of the 1982 Kwik Sak robbery that he and the victim committed. The State contends that the robbery was highly probative of the defendant's motive to kill the victim. The State also correctly notes that the defendant has again failed to cite to the record in his brief and urges this court to treat this issue as waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived"). Although we note this shortfall, we decline to treat the issue as waived and choose to address the issue on the merits.

Evidence of a defendant's prior crimes, wrongs, or acts is not generally admissible to prove that he committed the crime in question. Tenn. R. Evid. 404. The rationale underlying the general rule is that admission of such evidence carries with it the inherent risk of the jury's convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than upon the strength of the evidence. *State v. Thacker*, 164 S.W.3d 208, 239 (Tenn. 2005). The risk is greater when the defendant's prior bad acts are similar to the crime for which the defendant is on trial. *Id.* at 239; *see also State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996).

Notwithstanding the general rule, evidence of a defendant's prior crimes, wrongs or acts may be admissible where it is probative of material issues other than conduct conforming with a character trait. Tenn. R. Evid. 404(b). Thus, evidence of a defendant's character may become admissible when it logically tends to prove material issues which fall into one of three categories: (1) the use of "motive and common scheme or plan" to establish identity, (2) to establish the defendant's intent in committing the offense on trial, and (3) to "rebut a claim of mistake or accident if asserted as a defense." *Thacker*, 164 S.W.3d at 239 (citing *McCary*, 922 S.W.2d at 514). To admit such evidence, the rule specifies three prerequisites:

> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admission is that the court must find by clear

and convincing evidence that the defendant committed the other crime. *Id.*, Advisory Commission Cmts.; *DuBose*, 953 S.W.2d at 654; *State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985).

In reviewing a trial court's decision to admit or exclude evidence, an appellate court may disturb the lower court's ruling only if there has been an abuse of discretion. *Thacker*, 164 S.W.3d at 240. Its determination is entitled to deference when it has substantially complied with the procedural requisites of Rule 404(b). *See DuBose*, 953 S.W.2d at 652.

In the present case, the trial court conducted a pretrial hearing to generally consider the admissibility of other-act evidence.[2] Relevant to the Kwik Sak robbery, Ms. Smith testified that the defendant threatened the victim concerning the victim's loose-talk about the robbery. Ms. Burroughs testified that the defendant bragged to her during their marriage about his committing several robberies with the victim. She recalled the defendant's pleading guilty to the Kwik Sak robbery. The defendant's sister, Renee Brown, testified that the defendant told her about committing a robbery sometime around 1982. In his statement to investigators, the defendant admitted committing the 1982 Kwik Sak robbery with the victim. With this evidence, the trial court ruled that the State established the Kwik Sak robbery by clear and convincing evidence, that evidence of the robbery was material to the defendant's motive to kill the victim, and that the probative value of the evidence was not outweighed by the danger of unfair prejudice.

The record further reveals that the trial court conducted detailed jury-out hearings concerning other-act evidence prior to each witness's testimony. Because the trial court painstakingly complied with the requirements of Rule 404(b), this court will review the trial court's determination for an abuse of discretion. Under this standard of review, this court will only reverse the trial court's ruling if the lower court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004).

Evidence of the Kwik Sak robbery was introduced by the State to show motive and premeditation. At trial, the State presented witnesses who testified that the defendant threatened the victim to "keep his mouth shut" regarding the robbery. Other witnesses testified that the defendant admitted he killed the victim because the victim was considering

---

[2] The trial court excluded reference to another robbery that the defendant and victim may have committed based upon a lack of clear and convincing evidence concerning that offense. The trial court also excluded reference to the defendant's suicide attempt, which he purportedly committed in 1982 to avoid scrutiny or apprehension for the victim's murder.

talking to the authorities about the robbery. The trial court properly instructed the jury that the evidence could be considered for the limited purpose of determining whether it showed the defendant's motive to kill the victim. Motive is a relevant circumstantial fact that refers to why a defendant did what he did. The motive and intent of the defendant in the commission of a murder are almost always critical issues. *State v. Gentry*, 881 S.W.2d 1, 7 (Tenn. Crim. App. 1993). Evidence of motive is often pertinent as the basis to infer that the act was committed, to prove requisite mental state, or to prove the identity of the actor. *See* 22 C. Wright & K. Graham, Jr., *Federal Practice and Procedure Evidence* § 479 (1978). Indeed, the defendant's possession of a motive strengthens the inference that the death of the victim was caused by an intentional act rather than by accident. Further, we cannot conclude that the trial court abused its discretion in determining that the probative value of the evidence outweighed its prejudicial impact. Accordingly, the admission of evidence of the Kwik Sak robbery was not error.

*Evidence of Abuse During Marriage(s)*

The defendant argues that the trial court erroneously "allowed [his] ex-wife to testify that he was abusive during their marriage" in contravention of Rule 404(b). The State correctly notes that the defendant once again failed to cite to the record in support of his argument. For that reason, we could treat this issue as waived on this basis alone. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived"). Alternatively, the State discerns that "it appears that the testimony complained of was that of Donna Burroughs" and urges this court to hold that the testimony was not improper.

We, however, are unable to discern that the defendant's complaint relates to Ms. Burroughs' testimony. Each of the defendant's ex-wives, in fact, testified regarding her fear of the defendant as an explanation of her failure to report the defendant's admissions and, specifically in Ms. Burroughs' case, as an explanation of Ms. Burroughs' false report made to the police in 1982. Additionally, our review of the record reveals that the defendant failed to contemporaneously object to any references to this abusive behavior. Indeed, in many instances, the defendant elicited the references to abuse during cross-examination of the ex-wives concerning the veracity of their statements vis-a-vis their failure to report the defendant's admissions. Under these circumstances, we deem this issue waived. *See* Tenn. R. Evid. 103(a)(1) ("Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground is not apparent from the context."); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of the

-19-

error.").

*Photograph of Victim's Body*

The defendant next argues that the trial court erred by admitting a photograph of the deceased victim taken at the scene because, he contends, the photograph was gruesome and prejudicial. *See* Tenn. R. Evid. 403. The State contends that the probative value of the photograph, to show the absence of the victim's boots and the victim's clean white socks so as to indicate the boots were stolen from the victim's body after his being shot, was not substantially outweighed by the danger of unfair prejudice posed by the graphic nature of the photograph.

The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. *See State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). Under these rules, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; *Banks*, 564 S.W.2d at 949. Next, the trial court must determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951. Photographs offered by the State must be relevant to prove some part of its case and must not be admitted solely to inflame the jury and prejudice it against the defendant. *Id.* Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. *Banks*, 564 S.W.2d at 949; *see also State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); *State v. Allen*, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

The trial court determined that the photograph was relevant to establish not only the time of death but also to show that the victim was shot when wearing his boots and that the boots were taken from him after he fell to the ground. The trial court also determined that the photograph was the least gruesome of the crime scene photographs because it did not depict a clear view of the victim's nearly-absent torso. In our view, the photograph is the least gruesome of the photographs taken of the victim's body as found at the scene. It shows the victim's body from a vantage point of his socked feet with no clear view of the condition of his body from above the waist. The photograph is clearly probative of the time of the victim's death and to establish that the victim's boots were taken after he was shot. Accordingly, we conclude that the trial court did not abuse its discretion by admitting the photograph.

-20-

*Conclusion*

The trial court properly denied the defendant's motion to dismiss the indictment. The trial court properly admitted evidence of the Kwik Sak robbery and the photograph of the victim's body at the scene. The trial court did not commit reversible error by admitting movie clips from *Miller's Crossing*. The defendant waived his issue regarding the admission of evidence concerning his abuse of his ex-wife by failing to cite to the record, failing to object contemporaneously to objectionable testimony, and by eliciting much of the evidence through cross-examination. The evidence is sufficient to support the defendant's convictions. We affirm the judgments of the trial court, which reflect the jury's verdicts and proper merger of the convictions into one for first degree premeditated murder.

_____
JAMES CURWOOD WITT, JR., JUDGE